**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br>Plaintiff,<br><br>v.<br><br>BENSON ENTERPRISES, INC.;<br>INGRAM PARK CHRYSLER JEEP, INC.;<br>AND BENSON NISSAN, INC.,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 5:24-cv-01072-XR |

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON CLAIMANT REBECCA OWEN AND PLAINTIFF-INTERVENOR REBECCA OWEN'S CLAIMS**

---

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Defendants Benson Enterprises, Inc., Ingram Park Chrysler Jeep, Inc., and Benson Nissan, Inc. (collectively, "Defendants") respectfully move this Court for summary judgment on all claims brought by Plaintiff and Plaintiff-Intervenor Rebecca Owen ("Owen") under Title VII of the Civil Rights Act of 1964. Owen asserts three claims: (1) hostile work environment based on sex; (2) discriminatory termination based on sex; and (3) retaliatory termination for engaging in protected activity. *See* ECF No. 1 at ¶¶ 18–20; ECF No. 11 at §§ IV-VI. As demonstrated below, the undisputed evidence establishes that Defendants are entitled to judgment as a matter of law on each claim.

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Owen's Employment and the Business Link Program

1. Owen was employed as a Fleet Service Advisor at Ingram Park Chrysler Jeep ("IPAC"), a car dealership owned by Benson Enterprises. See ECF No. 1 at ¶15.

2. Owen's job duties required her to be a service writer for vehicles in connection with the dealership's participation in Chrysler's "Business Link" program. Ex. A, Owen Depo. at 62:24-63:8, 65:12-19; Ex. B, Foust Depo. at 51:1-8.

3. Business Link is a program through Stellantis (i.e., Chrysler) that authorizes dealerships to both sell larger commercial vehicles, such as flatbeds and cab chassis, as well as to service these types of vehicles and perform warranty work on them. Ex. B, Foust Depo. at 14:19-15:24.

4. Owen was a part of the process when the dealership originally signed up for Business Link in approximately early 2019. Ex. A, Owen Depo. at 62:24-63:8, 65:12-19. Ex. B, Foust Depo. at 51:1-8.

5. Owen worked alongside her husband, Terry Anderson, who was a technician at IPAC. Ex. A, Owen Depo. at 8:1-9.

6. IPAC built a separate building at the back of the dealership specifically to handle BusinessLink and heavy commercial vehicles that were part of Ms. Owen's clientele. Ex. B, Foust Depo. at 51:1-52:14.

7. Although it performed service and warranty work under the BusinessLink program, IPAC was never in full compliance with Chrysler's requirements for the program because IPAC never had a sales department or maintained an inventory of vehicle models that would qualify as BusinessLink vehicles; IPAC serviced BusinessLink vehicles but it did not sell them, which did not comply with the BusinessLink program. Ex. B, Foust Depo. at 23:2-20, 23:21-25:19.

8. At all relevant times, Randy Foust was the Managing Director for IPAC. Ex. B, Foust Depo. at 9:14-19. Foust was responsible for the profitability of the Benson dealerships and was involved on a daily basis with the management of each dealership, including the General Managers ("GMs"). Ex. B, Foust Depo. 9:21-10:5.

9. In about late 2020 or early 2021, Chrysler representatives contacted the GM of IPAC, Wes Skidmore, and began threatening to eliminate IPAC's ability to perform warranty work on BusinessLink vehicles unless IPAC set up a sales department for BusinessLink vehicle models. Ex. B, Foust Depo. at 26:4-14; 28:14-29:1.

10. IPAC concluded that, for a variety of reasons, including concerns over inventory, lot availability, local competition, and profitability, it did not make business sense to begin selling BusinessLink vehicles. Ex. B, Foust Depo. at 23:21-25:10, 29:2-18, 34:19-35:11.

11. IPAC informed Chrysler that it was not going to become a BusinessLink dealer but decided to drag out its ability to continue to perform service and warranty under the BusinessLink program as long as it could. Ex. B, Foust Depo. at 34:19-35:11.

12. Chrysler increased its pressure on IPAC over the issue, and IPAC realized that eventually Chrysler would quit paying warranty claims if IPAC continued. Ex. B, Foust Depo. at 34:19-37:9.

13. IPAC's BusinessLink work dwindled through 2021, and eventually IPAC's participation in the program ended. Ex. B, Foust Depo. at 43:12-44:17, 44:21-45:7.

**B. Philip Germain's Discovery of Owen's Misconduct and Owen's Termination**

14. Philip Germain ("Germain") became the service manager at IPAC on or about January 11, 2021. Ex. C, Germain Depo. at 11:5–8.

15. In the February or March 2021 timeframe, Germain informed Owen and her husband Terry Anderson that the Business Link program was likely going away. Ex. C, Germain Depo. at 144:8-145:1.

16. Subsequently, and independently of the BusinessLink program itself, Germain was alerted by a parts counter employee about Owen's possible misconduct regarding Owen's write ups on repair orders ("ROs") for over-the-counter parts. Ex. C, Germain Depo. at 176:18 - 177:11.

17. After being alerted to the issue, Germain conducted an investigation in about May of 2021, by looking at a six-months window of ROs, which he then provided to the General Manager, Wes Skidmore. Ex. C, Germain Depo. at 55:23-57:3, pp. 177-185, Ex. 31 thereto.

18. By closing these ROs Owen wrongly took commissions for over-the-counter parts that she was not entitled to, which is a form of theft against the dealership. Ex. C, Germain Depo. at 115:7-24, 179:1-19, 181:16-23, 183:2-8, 185:13-186:6.

19. Germain provided the ROs and discussed the matter with Skidmore that the ROs were grounds for Owen's termination, and Skidmore told Germain that he would get back with him about it. Ex. C, Germain Depo. at 57:7-12, 176:24-177:12, Exhibit 31 thereto.

20. When Skidmore got back with Germain, he informed him that the dealership had opted to simply terminate Owen's job position because BusinessLink was going away anyhow. Ex. C, Germain Depo. at 187:22-188:6.

21. IPAC dwindled down until it stopped participating altogether at the end of 2022 or beginning of 2023. Ex. C, Germain Depo. at 140:22-141:5. However, IPAC decided to terminate Owen's position prior to the actual end of the BusinessLink program after learning of Owen's misconduct with the parts-only ROs. Ex. B, Foust Depo. 104:20-105:23.

**C. Owen's Complaints and the Timeline of Her Termination**

22. Owen claims she verbally contacted Benson's Human Resources Manager, Lindi Conrad, on approximately June 9, 2021. *See* ECF No. 1 at ¶ 19(c); ECF No. 11 at ¶ 24.

23. Hornsby told Conrad to instruct Owen to submit a formal written complaint. Ex. D, Hornsby Depo. at 26:4-11.

24. Owen submitted a written complaint to Conrad on June 10, 2021. *Id*. *See* ECF No. 1 at ¶ 19(c); ECF No. 11 at ¶ 24.

25. On June 11, 2021, Owen's position was eliminated. Ex. D, Hornsby Depo. at 46:7-8.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court reviews all evidence in the light most favorable to the nonmoving party. *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 823 (5th Cir. 2019); *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 576 (5th Cir. 2020). The nonmoving party must go beyond the pleadings and present specific evidence showing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III. ARGUMENT

### A. Owen's Hostile Work Environment Claim Fails as a Matter of Law

A plaintiff may establish a Title VII violation by proving that sex discrimination has created a hostile or abusive working environment. *Woods v. Delta Bev. Group, Inc.,* 274 F.3d 295, 299 (5th Cir. 2001), citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). In order to establish a hostile working environment claim, a plaintiff must prove five elements: (1) the employee belonged to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. The employee only needs to establish the first four elements if the alleged harasser is a supervisor. *Id.* at fn. 2. In order to be actionable, the alleged harassment must have created an environment that a reasonable person would find hostile or abusive. *Woods at 299*. Whether a reasonable person would find the environment to be hostile or abusive should be evaluated by looking at the totality of the circumstances. This includes the frequency of the discriminatory conduct, its severity,

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371 (1993). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted).

Owen's alleges that she was subjected to severe, pervasive, sexist comments. (*see* ECF No. 1. ¶ 19(a).) The evidence is otherwise. When deposed, Owen could only identify approximately seven instances of comments she considered discriminatory over the course of roughly five months, namely:

- Women shouldn't bring cars in for service because they don't know if a recall's been done before. Ex. A, Owen Depo. at 14:9-25
- You can't expect much from women; they don't work hard. Ex. A, Owen Depo. at 15:6-19.
- Women feel intimidated by him. Ex. A, Owen Depo. at 15:6-16:4
- Affirming another employee, Paul Carter's, remark that women don't belong on the drive. Ex. A, Owen Depo. at 15:6-16:14.
- Taking time off for a wedding is "a woman thing." Ex. A, Owen Depo. at 19:3-10.
- "I raised three daughters and a wife." Ex. A, Owen Depo. at 19:13-20.
- Calling Robin Unger a "fat, lazy B." Ex. A, Owen Depo. at 20:1-5.

Germain denied making each of these statements under oath. Ex. C, Germain Depo. at 107:6-108:2; 108:12-109:25. But even taking Owen's allegations as true, under Fifth Circuit precedent, these are the type of "offhand comments" and "isolated incidents" that do not rise to

actionable harassment. The remarks were sporadic and none were physically threatening or explicit. Several were not directed at Owen at all (the Unger comment, the "shouldn't bring cars in" comment, and the Carter affirmation). The "raised a wife" comment is, at worst, the kind of boorish, gender-insensitive commentary the Fifth Circuit has repeatedly held insufficient to create a hostile work environment. See *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 874 (5th Cir. 1999) (boorish comments over time and physical touching incident held insufficient as a matter of law); *Hockman v. Westward Communications, LLC,* 407 F.3d 317 (5th Cir. 2004) (attempted kissing, and grabbing or brushing against Plaintiff's breasts and behind held insufficient as a matter of law). Even taken together, Germain's alleged remarks are insufficient to support an actionable claim of hostile work environment as a matter of law.

Owen appears to also assert facially neutral, non-verbal conduct as evidence of her hostile work environment claim, for example, that Germain promoted her "assistant" Pete Hernandez to a different job position, or that Germain left Owen off text messages. ECF No. 1, at p. 6. These allegations cannot demonstrate a hostile working environment because Owen cannot show they were based on sex. Title VII is not general civility code. *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 80 (1998). The plaintiff must always prove that the conduct at issue was not merely tinged with offensive sexual connotations but actually constituted "discrimination . . . because of . . . sex." *Id.* at 81. Therefore, facially neutral incidents may be considered in a hostile work environment claim only if the plaintiff can offer evidence from which a reasonable jury could infer that the facially neutral incidents were in fact discriminatory. See, *Rodriguez v. City of New York,* 644 F.Supp.2d 168, 190 (E.D.N.Y. 2008). Owen has no evidence that the type of workplace management decisions or annoyances she complains of were

based on sex. In fact, the deposition testimony from Owen and others in this case shows that Owen's many dissatisfactions were not based on sex. For example:

**Germain took away her assistant, Pete Hernandez**. When Germain took the job at IPAC his service manager at the time was "basically a no show." Pete Hernandez had prior experience in the role of service manager, so Germain promoted him to the job. Ex. C, Germain Depo. at 24:20-25:3, 22:21-23:12. Owen cannot show evidence of animus based on sex for this routine management decision.

**Germain left Owen off text messages.** The decision as to who needs to be included in particular communications is a routine management decision. But, in any case, there is no evidence Germain discriminated based on sex. To start, the evidence shows Germain simply did not have contact information for everyone that worked under him in his phone, and he would ask others on the text to help spread whatever message he wanted to communicate. Ex. C, Germain Depo. at 83:12-85:4, Ex. 6 at p.3 thereto, Ex. 7 at p.3 thereto. Germain routinely texted Owen's husband, Terry Anderson, so no reasonable jury could conclude Germain was trying to exclude Owen from any information since it would obviously be passed on to her by Terry. See, *Id.* In fact, Owen did not have Germain's phone number either, so she would ask Terry to communicate with Germain for her, such as when she wanted to tell him she was running late for work. Ex. E, Anderson Depo. at 19:13-20:4; Ex. C, at Ex. 12 thereto. This demonstrates that neither had the other's phone number, neither felt the need to have the other's phone number, and that Germain – and Owen – believed they could count on any relevant communications being passed along through Owen's husband, Terry Anderson. It does not demonstrate discrimination based on sex.

Further, the evidence shows Germain routinely included women on text messages. See, e.g., Ex. C, Germain Depo. at 87:5-88:2, Ex. 7 thereto (Germain text including Ashley Huerta, Debbie, and Mary), 89:19-90:5, Ex. 9 thereto (text including Tammie Faulkner-Taylor); 90:13-16, Ex. 13 thereto (texts including Debbie and Ashley), also, Exs. 14, 15, 17, thereto. This directly contradicts Owen's claim that she was left off any texts because of sex.

**Denial of phone-ups from BDC.** Owen complains that she was not getting "phone ups" from IPAC's BDC (marketing) because she was a woman. Ex. A, Owen Depo. at 92:14-25. Her reason is nothing but speculation and hearsay on hearsay, namely that the BDC employee told her that Germain said Owen was "too far in the back." *Id*. Even taking all this as true, however, it does not show conduct based on sex; it shows the decision was based on the fact that Owen worked in a separate building in the back of the dealership intended for heavy commercial vehicles, which Owen admits were ugly, noisy, dirty, and had caused damages before on the main drive. Ex. A, Owen Depo. at 62:6-16. Even taking the BDC allegation as true, Germain's reluctance to send vehicles to the back is understandable for business reasons unrelated to any gender animus.

**Other advisors writing up her customers**. Owen complains that other service advisors wrote up her customers. See, e.g., Ex. A, Owen Depo. at 50:2-51:1. But she admits that she does not believe that these service advisors wrote up her customers based on sex. Ex. A, Owen Depo. at 51:2-5. When pressed about why this would even be sex-based conduct, Owen could only offer "because I was the only one it was happening to." Ex. A, Owen Depo. at 53:7-10.

In short, whenever asked why she believed a particular action or decision by Germain was discriminatory based on her sex, Owen repeatedly fell back on "I was the only one it was happening to." Ex. A, Owen Depo. at 51:15, 52:12, 53:9-10, 109:21-25. This is mere speculation

or conjecture that is insufficient to establish a nexus between Germain's allegedly offending conduct and a gender-based animus. See, *Peda v. Am. Home Products Corp.,* 214 F.Supp.2d 1007, 1019 (N.D. Iowa 2002). This is particularly true here where Owen was the only service advisor that worked in a separate building off the main service drive dedicated to servicing heavy commercial vehicles and BusinessLink service. Even if Owen did not care for Germain or found him difficult to get along with, that is not actionable. She has no evidence that she was singled out because of her gender by Mr. Germain.

Furthermore, Germain acknowledged that Owen "did well at her job" when asked whether she performed well. Ex. C, Germain Depo. at 115:4-6. Germain also confirmed he had no issues with her job performance. Ex. C, Germain Depo. at 115:7-9. offer from Ancira in the February–March 2021 timeframe, Germain asked her not to leave. Ex. C, Germain Depo. at 113:11-114:4. This is flatly inconsistent with any suggestion that Germain harbored a discriminatory animus toward Owen or desired her termination based on sex.

Finally, even looking at the evidence in its entirety, it still lacks the severity required under Title VII. The Fifth Circuit consistently requires that the conduct be both objectively and subjectively offensive and that it be extreme in nature. *See Shepherd* at 168 F.3d 874. There is no evidence of physical threats, sexually explicit conduct, or conduct that would rise to the level of severity required to support a hostile work environment claim. Owen herself acknowledged that the resolution she sought was simply that "everybody could come together and . . . figure it out and somehow fix it" so that they "could all work together." Ex. A, Owen Depo. at 122:10-123:3.

**B. Owen's Discriminatory Termination Claim Fails Because Defendants Have Articulated a Legitimate, Non-Discriminatory Reason, and Owen Cannot Establish Pretext.**

Owen has no direct evidence of discrimination. Therefore, her claim for discrimination is analyzed using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973). *Alvarado v. Texas Rangers* 492, F.3d 605, 611 (5th Cir. 2007). Under this framework, a plaintiff must first create a presumption of intentional discrimination by establishing a prima facie case. *Id*. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id; Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). The burden on the employer at this stage "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Id.* (quoting *Reeves*, 530 U.S. at 142). If the employer sustains its burden, the prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Alvarado* 492 F.3d at 611.

Owen's job duties were tied to IPAC's participation in Chrysler's BusinessLink program. Owen was part of IPAC's original signing up for the BusinessLink program in early 2019. Ex. A, Owen Depo. at 65:15-19. Owen herself admits that for BusinessLink vehicles, such as heavy-duty 3500, 5500s, and ProMasters, it does not make sense for the dealership to work on them unless it could submit warranty claims to Chrysler under the BusinessLink program. Ex. A, Owen Depo. at 65:20-66:9. Owen worked at the back of the dealership in a separate building built for the BusinessLink work. Ex. B, Foust Depo. at 51:1-52:14. The building had a special 30,000 lift installed so that IPAC could do BusinessLink work. Ex. A, Owen Depo. at 68:1-6. As fleet advisor it was Owen's job duty to service BusinessLink customers. Ex. A, Owen Depo. at 68:19-21.

However, IPAC was never in full compliance with BusinessLink because the dealership did not sell or inventory BusinessLink vehicles. Ex. B, Foust Depo. at 23:2-20. In about late

2020 or early 2021, Chrysler representatives began threatening to eliminate IPAC's ability to perform warranty work on BusinessLink vehicles unless IPAC set up a sales department for BusinessLink vehicle models. Ex. B, Foust Depo. at 26:4-14; 28:14-29:1. IPAC had discussions with Chrysler about the BusinessLink program for a few months beginning in about late 2020 or early 2021. Ex. B, Foust Depo. at 28:14-29:1. But ultimately, IPAC decided it did not make financial sense to have a BusinessLink sales department. Ex. B, Foust Depo. at 28:14-29:18. Owen admits that she was aware in February 2021 that IPAC might not continue to be a part of BusinessLink. Ex. A, Owen Depo. at 136:3-25. Despite the fact that IPAC was not going to continue with BusinessLink, it decided to drag out doing BusinessLink work in a tug of war with Chrysler until it became enough of a business problem that IPAC risked not being paid on its warranty claims. Ex. B, Foust Depo. at 36:12-38:17. IPAC's BusinessLink work diminished and eventually ended in late 2022 or early 2023. Ex. B, Foust Depo. at 43:12-44-17, 44:21-45:7.

However, IPAC decided to eliminate Owen's position, and Ms. Owen with it, before BusinessLink finally came to an end because Germain discovered that Owen was writing up repair orders ("ROs") for over-the-counter parts, essentially giving herself commissions that she was not entitled to. SOF 15 – 17. In about May 2021, approximately a month before Owen's termination, Germain was alerted to the RO misconduct by a parts counter employee at IPAC. Ex. C, Germain Depo. at 55:23-57:3. Germain investigated by reviewing about six months of ROs looking for evidence. *Id*. (also see generally Ex. C, Germain Depo. at pp. 177 – 184, and Exhibit 31, thereto, discussing ROs in detail). In Germain's view, by closing these ROs Owen wrongly took commissions for herself on over-the-counter parts that she was not entitled to, which is a form of theft against the dealership. Ex. C, Germain Depo. at 115:7-24, 179:1-19,

181:16-23, 183:2-8, 185:13-186:6. Germain intended to terminate Owen for this theft; he did not want to keep her as an employee. Ex. C, Germain Depo. at 119:15-120:1.

Germain took the ROs documenting Owen's misconduct to his GM at the time, Wes Skidmore, and told him Owen needed to be terminated. Ex. C, Germain Depo. at 120:2-7, Skidmore told Germain that he would get back with him about it. Ex. C, Germain Depo. at 57:7-12, 176:24-177:12. When Skidmore got back with Germain he informed him that the dealership had opted to simply terminate Owen's job position because BusinessLink was going away anyhow. Ex. C, Germain Depo. at 187:22-188:6.

Foust confirms that Owen's position was eliminated early because of the discovery of her misconduct. Ex. B, Foust Depo. at 98:14-99:9 ("we did – were, in fact, planning on eliminating the position. This just solidified my decision to terminate early then maybe it would have happened otherwise."). See, also, Ex. B, Foust Depo. at 104:20-105:23 (explaining that Owen's position was eventually going away with the BusinessLink program, but in view of the theft problem, he chose to terminate her position when he did).

The burden therefore shifts to Owen to demonstrate that these reasons are pretextual. "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013). Owen cannot carry this burden. Owen has no substantial evidence that Germain, Foust, or anyone else at IPAC was motivated by animus toward her gender. To the contrary, as pointed out earlier, Germain acknowledged that Owen "did well at her job," and that when she received a job offer from Ancira in the February–March 2021 timeframe, (before he learned of her misconduct) Germain asked her not to leave. Ex. C,

Germain Depo. at 113:11-114:4. Owen confirms Germain's testimony on this point. Ex. A, Owen Depo. at 56:8-10. This plainly demonstrates that Germain was not motivated to terminate Owen based on animus toward her gender. Further, Owen cannot show evidence of any similarly situated employees that had her job responsibilities or engaged in the same conduct with respect to obtaining commissions on parts only ROs.

**C. Owen's Retaliation Claim Fails Because She Cannot Establish But-For Causation.**

To be sure, temporal proximity between the alleged protected activity and her termination may be sufficient to meet a prima facie case for retaliation, however, without more, it is not sufficient to demonstrate pretext. *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 579 (5th Cir. 2020). The *McDonnell Douglas* evidentiary framework applies to Title VII retaliation claims brought under a pretext theory. *Septimus v. Univ. of Houston,* 399 F.3d 601, 608 (5th Cir. 2005). Under that framework, the employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose. *Id*. The proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct. *Id*.

As already addressed above with respect to the *McDonnell Douglas* analysis of Owen's discrimination claims, Defendants have shown that Owen was terminated because she wrongly submitted ROs in her name on parts-only sales, so IPAC opted to terminate her by simply eliminating her position.

For retaliation, it is not enough for Owen to show that her protected activity was *a* motivating factor in her termination; she must prove that she would not have been terminated but for her complaint. To survive a motion for summary judgment, Owen must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the adverse

employment action but for the protected activity." *Brown*, 969 F.3d at 577 (quoting *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 561 (5th Cir. 2019) (quoting *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012).

The Fifth Circuit has held that temporal proximity combined with additional indicia may survive summary judgment, such as evidence of "a dispute of facts leading up to termination, disparate treatment of a similarly situated employee, harassment from a supervisor following the protected activity, the stated reason for the termination being known to the employer for years, and the employer standing to lose millions of dollars if its conduct was discovered." *Brown*, 969 F.3d at 581. But here, Owen has none of these additional factors. There is no evidence of disparate treatment of a similarly situated employee. There is no evidence of post-complaint harassment. The RO investigation was conducted in May 2021, just shortly before Owen's termination on June 11, 2021, and there is no evidence of any financial incentive to suppress Owen's complaint. When the evidence is viewed in totality, no reasonable factfinder could conclude that Owen's protected activity was the but-for cause of her termination.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant summary judgment in their favor on all of Plaintiff EEOC's claims and Plaintiff-Intervenor Rebecca Owen's claims for hostile work environment, discriminatory termination, and retaliation under Title VII of the Civil Rights Act of 1964 for Claimant Rebecca Owen.

Respectfully Submitted,

**JOHNSON DELUCA KURISKY & GOULD**
**A PROFESSIONAL CORPORATION**

By: */s/ Matthew G. Reeves*

Donald W. Gould, II
Texas State Bar No. 08234250
dgould@jdkglaw.com
Matthew G. Reeves
Texas State Bar No. 00791498
mreeves@jdkglaw.com
Arthur G. Formas III
Texas State Bar No. 24145441
aformas@jdkglaw.com
4 Houston Center
1221 Lamar, Suite 1000
Houston, Texas 77010
(713) 652-2525 - Telephone
(713) 652-5130 - Telecopier

**ATTORNEYS FOR DEFENDANTS,
BENSON ENTERPRISES, INC.,
INGRAM PARK CHRYSLER JEEP, INC.
AND BENSON NISSAN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been delivered to all counsel of record on March 20, 2026, as follows:

***Via ECF:***
Philip Moss
Shannon Black
Equal Employment Opportunity Commission
207 South Houston, Street, 3rd Floor
Dallas, Texas 75202

*Attorneys for Plaintiff Equal Employment Opportunity Commission*

***Via ECF:***
Kala S. Dumont
Law Offices of Gual and Dumont
4040 Broadway St. Suite 240-208
San Antonio, TX 78209

*Attorney for Plaintiff-Intervenor Rebecca Owen*

*/s/ Matthew G. Reeves*
Matthew G. Reeves