**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *Plaintiff* | § | |
| vs. | § | Case No. SA-24-CV-01072-XR |
| INGRAM PARK CHRYSLER JEEP, INC., *et al.*, *Defendants* | § | |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

On this date, the Court considered Defendants' motion for summary judgment on certain employment discrimination claims filed by the Equal Employment Opportunity Commission ("EEOC") and Plaintiff-Intervenor Rebecca Owen (ECF No. 61) and the responsive briefing (ECF Nos. 62, 64–66). After careful consideration, the motion is **DENIED**.

**BACKGROUND**

The EEOC filed this action against Defendants Ingram Park Chrysler Jeep, Inc. ("Ingram Park Chrysler" or "IPC"), Benson Enterprises, Inc. ("Benson"), and Benson Nissan, Inc. ("Benson Nissan"),[1] alleging sex discrimination and retaliation against Rebecca Owen and Tammie Faulkner-Taylor, IPC's only female service advisors by their supervisor, Phillip Germain, in violation of Title VII. ECF No. 1. Owen intervened as a Plaintiff in December 2024. ECF No. 11.

[1] Plaintiffs claim that Defendants operated as an integrated business enterprise, and that Benson owns both Ingram Park Chrysler and Benson Nissan. *Id.*

## I. Factual Background

Owen worked at IPC in San Antonio from March 2015 to June 2021, when she was terminated a day after filing a complaint with human resources. ECF No. 11 at 8. Faulkner-Taylor was hired as an express service advisor around November 2020. ECF No. 1 at 5.[2]

Owen began her employment at IPC as a service advisor to the general public on the "main service lane." In 2018, she was given the title of "fleet service advisor" because she focused mostly on business accounts with fleets of business Chrysler vehicles that needed servicing. ECF No. 61-1, Owen Dep. at 28:1–9; *see id.* at 41:20–42:1 (citing the General Services Administration, which held a large fleet of vehicles at Lackland Air Force Base, as one such customer).

In 2019, Owen helped establish IPC's membership in the "Business Link" program affiliated with Chrysler/Stellantis, which authorizes dealerships to both sell larger commercial vehicles, such as flatbeds and cab chassis, as well as to service these types of vehicles and perform warranty work on them. *See id.* at 65:17–66:21; ECF No. 61-2, Randy Foust (IPC Managing Director) Dep. at 14:19–15:24. Some, but not all, of Owen's clients had Business Link accounts. ECF No. 61-1, Owen Dep. at 137:13–138:17, 139:19–23. Owen's compensation was 100% commission based. ECF No. 64-3 at 13–14.

In late 2019 or early 2020, Owen was moved from the main service line to a separate building located in the rear of the dealership dedicated to fleet servicing because the fleet vehicles, including large trucks, had damaged the main service drive and were "ugly," "noisy," and "dirty." ECF No. 61-1, Owen Dep. at 62:6–16. Due to her location in the back, Owen relied on her assistant, Pete Hernandez, to direct customers to her and provide additional service to her clients. *Id.* at 58:9–12, 60:22–61:24. Owen was the only service advisor with an assistant. *Id.* at 58:13–59:3.

---

[2] Defendants' motion does not address the EEOC's claims on behalf of Faulkner-Taylor. *See generally* ECF No. 61.

### A. Germain's Sex-Based Comments[3]

In January 2021, Germain was hired as service manager, supervising both Owen and Faulkner-Taylor. ECF No. 61-3, Germain Dep. at 11:5–8.

Germain made several sex-based comments in the months he supervised them. Owen testified that he made derogatory comments about women employees and customers, such as:

- "You can't expect much from women; they don't work hard." ECF No. 61-1, Owen Dep. at 15:6–16.
- "[W]omen shouldn't bring cars in [for service]. They should let their husband do it because they don't even know if a recall's been done before." *Id.* at 14:9–25.
- Referring to another female employee at IPC as a "fat, lazy B-word." *Id.* at 20:2–3.

Germain also made demeaning remarks about his own wife—"I've raised three daughters and a wife," *id.* at 19:19–20—and multiple comments criticizing and belittling Owen specifically. When she asked for time off in February 2021 for her daughter's wedding, Germain told her that "that's a woman thing; men don't take time off from their important jobs for things like weddings." *Id.* at 19:4–9. In a conversation about IPC's operations, Germain told Owen, "I don't really understand what it is that you do." *Id.* at 108:12–13. When Owen offered to explain her duties, he said, "I doubt you could tell me anything, or you could explain anything." *Id.* at 108:14–16.

Germain was not the only male employee making sex-based comments at IPC. For example, Owen testified that Paul Carter, a service advisor hired shortly after Germain, told Owen's coworkers that she was a "swinger." *Id.* at 103:11–25. Owen overhead Carter tell Germain that "women don't really belong on the [service] drive." *Id*. at 16:8–9. Germain agreed: "You got that right." *Id*.

[3] In his own deposition, Germain denied making each of these statements. ECF No. 61 at 5.

Owen testified that, around February 2021, she approached Germain and told him she felt that she was being treated differently as a woman. *Id.* at 125:12–126:5. Germain responded that "women feel intimidated by him." *Id.* at 126:8; *see also id.* at 16:2–3.

**B. Spring 2021**

In late January 2021, about two weeks after joining IPC, Germain promoted Owen's assistant, Hernandez, to a position as the service drive manager. *See* ECF No. 61-1, Owen Dep. at 70:5–10; ECF No. 61-3, Germain Dep. at 22:21–25, 23:1–12, 25:24–25, 26:1–2. Despite Owen's requests, her assistant was never replaced. ECF No. 61-3, Germain Dep. at 26:21–27:12.

In February 2021, Germain informed Owen, her husband, Terry Anderson (who also worked at IPC),[4]and Paul Carter that IPC was not going to renew with Business Link due to a disagreement with Chrysler/Stellantis. *See* ECF No. 61-1, Owen Dep. at 136:9–18. Carter, who had brought several fleet clients with him from his previous dealership, said he would not stay at IPC if it ended its Business Link relationship. *Id.* at 82:11–12, 136:18–20. Germain replied that it was not "set in stone" and never raised the issue with Owen again. *Id.* at 136:21–25. Ultimately, it appears that IPC continued servicing fleet vehicles through Business Link until at least July 2025. *See* ECF No. 64-7 at BENSON 1585–1904. Indeed, IPC failed to produce any documents showing when—or even whether—it stopped participating in Business Link. ECF No. 65-8 at 5–7.

In March 2021, Faulkner-Taylor transferred to another dealership because she "did not feel secure in [her] position as a service [advisor] . . . under Mr. Germain," leaving Owen as the only female service advisor. ECF No. 64-4, Faulkner-Taylor Dep. at 27:14–16.

[4] ECF No. 61-5, Anderson Dep. at 11:15–17.

### C. Changes in the Terms and Conditions of Owen's Employment

Beyond Germain's alleged verbal comments, Owen presented evidence of conduct that tangibly affected the terms and conditions of her employment, including her compensation.

**Loss of customers to male service advisors.** After Hernandez was promoted, male service advisors began to write up Owen's fleet customers for service rather than directing them to Owen, resulting in a loss of income. ECF No. 61-1, Owen Dep. at 31:1–19, 50:2–25, 51:1–25, 52:1–25, 53:1-25, 54:1–15. At times, customers would call Owen because she was not made aware they were at the dealership. *Id.* at 73:9–22, 74:1–25, 79:24–25, 80:1–16. Owen testified that Germain frequently directed her fleet customers to male general service advisors to be written up, instead of directing them to Owen. ECF No. 61-1, Owen Dep. at 31:1-19, 50:2-25, 51:1-25, 52:1- 25, 53:1-25, 54:1-15 (Owen Dep.).

Owen, on the other hand, was not permitted to write up non-fleet customers like her male counterparts could. When she asked for additional opportunities to service customers by working the main drive (and thereby increasing her wages through the commissions), Germain denied her requests. ECF No. 61-1, Owen Dep. at 31:15-19, 106:13-25, 107:1-25, 108:1-18, 109:6–10, 17–25; ECF No. 61-3, Germain Dep. at 59:25, 60:1–25 ("every day" she was complaining about not getting her fleet vehicles), 61:1, 23–25, 62:1–21, 25, 63:1–3, 193:1–25, 194:1–9 (Carter on main drive performing fleet services). In the same vein, Owen asserts that, unlike her male counterparts, she was not allowed to close tickets at the end of the month for jobs where the work was completed but the vehicles had not yet been picked up. ECF No. 61-1, Owen Dep. at 31:11–13, 33:17–35:5.

**Exclusion from meetings and communications.** Owen testified that Germain held meetings for male service advisors and did not invite Owen to attend. ECF No. 61-1, Owen Dep. at 26:2–12, 148:1–15. She learned from a co-worker that Germain had also excluded her from

group text messages containing critical work information that could affect her compensation. *Id.* at 54:20–25, 87:3–25, 88:1–25; 89:1–8. Faulkner-Taylor, the only other woman performing a service advisor-type role at IPC, also asserts that Germain excluded her from group text messages and denied her bonus opportunities. *See* ECF No. 62-4, Faulkner-Taylor Dep. at 12:4–21; ECF No. 62-2, Owen Aff. at 5.

**D. Owen's Complaints and Termination**

Owen described working at IPAC under Germain as being in a "battle every day." ECF No. 61-1, Owen Dep. at 26:13–25.

Still, in March and June 2021, Owen declined offers from another dealership, both because it was not a good time for her family to have her take on a new position and because she hoped the situation would improve at IPC. *See id.* at 152: 5–18.

Before filing a formal written complaint, Owen had spoken to several managerial and non-managerial employees at Benson. *Id.* at 13:4–10; ECF No. 64-2, Owen Aff. at 3 (identifying colleagues to whom she complained about Germain's behavior); ECF No. 1-2, Deposition of Randy Foust, Benson's Managing Director, at 71:6–9 (acknowledging that he was aware of Owen's complaints about her customers being serviced on the main drive). She even complained to Germain directly that he was shorting her pay and directing her customers to male service advisors. ECF No. 61-1 at 32:1–3, 38:6–15, 50:2–11. However, these complaints "were falling on deaf ears." *Id.* at 89:11–25, 90:1–24.

As a result, Owen called Lindi Barnes Conrad, Benson's Human Resources director, on May 25, 2021, to ask how to file a complaint against Germain. ECF No. 64-2, Owen Aff. at 3. Conrad said she did not have time for the complaint but would get back to her in early June. *Id.* at 6. She also mentioned that Owen could transfer to one of the other dealerships, like Faulkner-

Taylor had, but that it would result in lower pay. *Id.* On June 9, 2021, after not hearing back from HR, Owen again called Conrad, who told her to submit a complaint in writing. ECF No. 61-1, Owen Dep. at 13:4–10.

On June 10, 2021, Owen submitted a five-page written complaint to HR that described comments and actions she viewed as sex-based harassment and unequal treatment, including lost pay opportunities, exclusion from the male service-advisor text chain, and the diversion of her customers. *See* ECF No. 64-3 at 6–12.

The next day, Owen was terminated. Her termination report described the reason for separation as "position elimination" and indicated that Owen was rehireable. ECF No. 64-3 at 1; *id.* at 15–16 (unemployment benefits notice describing the separation as a "permanent layoff"). Even so, after terminating Owen, Germain had her escorted from the dealership to her car, or as Owen described it, had her "perp walked out"—something Owen had never seen in the six years she worked at the dealership, including when Germain terminated other employees. ECF No. 61-1, Owen Dep. at 129:23–25, 130:1–13, 147:16–20.

A few hours after the termination, Owen emailed Conrad and Benson's Chief Financial Officer, Barbara Hornsby, saying, "I don't think it to be coincidental that I filed a complaint yesterday and that I am terminated today." ECF No. 64-3 at 18. According to Owen, Conrad called her that afternoon and said she was "sorry for what happened" and, despite warning Germain that "it would be a bad idea" to terminate Owen, he "was set on it." ECF No. 62-2, Owen Aff. at 7. She advised Owen to speak to an attorney because she believed her rights had been violated. *Id.*

Germain reassigned Owen's fleet services duties to Paul Carter and the other main service advisors, all of whom were men. *See* ECF No. 61-3, Germain Dep. at 149:14–150:9. To this day, all service advisors at IPC are men. *See* ECF No. 62-6 at 11.

## II. Procedural History

Owen timely filed a written EEOC charge against Defendants on August 31, 2021, asserting claims of sex discrimination and retaliation. ECF No. 62-2.

In October 2021, IPC submitted its position statement to the EEOC, stating:

> On June 11, 2021, it was decided the Fleet Service Advisor position would be eliminated due to the fleet affiliated program "Business Link" being discontinued by the dealer…." with the loss of Business Link, the Fleet portion of the business was not viable to keep it as a service-only program in our Service Department.

ECF No. 64-3 at 3; *see also id.* at 4 (letter from Germain dated October 26, 2023 asserting that Owen was terminated because Business Link had been "shut down").

The EEOC determined in December 2023 that Owen had been harassed based on her sex and terminated in retaliation for her complaint about sex discrimination in violation of Title VII. *See* ECF No. 62-3.

In September 2024, the EEOC filed this suit alleging Defendants subjected Owen to a hostile work environment and disparate treatment based on sex—including both her termination and actions that caused her to lose clients and sales—and retaliation. ECF No. 1 ¶¶ 18, 19. The EEOC further alleged that Faulkner-Taylor was subject to disparate treatment based on sex. *See id.* Owen intervened in December 2024, alleging identical claims to those asserted in the EEOC complaint. *See* ECF No. 11.

Defendants now move for summary judgment on (1) Owen's hostile-work-environment claim, (2) her claim that she was terminated based on her sex, and (3) her retaliation claim. *See* ECF No. 61.[5] They argue that the Germain's conduct did not create a hostile work environment based on sex and that Owen did not subjectively perceive it as such. They also assert that Plaintiff

[5] The motion does not address the EEOC's claims on behalf of Taylor-Faulkner, nor any claims addressing disparate treatment that allegedly caused Owen to lose customers and sales. *See* ECF No. 61.

was terminated due to the expected wind-down of Business Link and for committing repair-order fraud—a theory never presented to the EEOC and not introduced in discovery until September 2025. The Court addresses each argument in turn.

## DISCUSSION

### I. Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little*, 37 F.3d at 1075 (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and

will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the Court will review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II. Analysis

### A. Title VII Hostile Work Environment

Title VII imposes liability in workplaces "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *West v. City of Houston*, 960 F.3d 736, 741–42 (5th Cir. 2020) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). To establish a Title VII hostile work environment

claim, a plaintiff must prove that she (1) was subjected to unwelcome harassment (2) based on sex (3) that affected a term, condition, or privilege of employment. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).[6]

The Court must first determine whether harassment is sex-based before inquiring if it is serious enough to create a hostile work environment. *See LaDay v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002). The first element can be established through (1) "sex-specific and derogatory terms" showing the harasser's "hostility to the presence of women in the workplace," (2) comparative evidence between how the harasser treats males and females, or (3) conduct motivated by sexual desire. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998).

If the harassment is sex-based, the Court must evaluate whether it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. "To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The alleged conduct must be objectively and subjectively hostile or abusive." *West*, 960 F.3d at 741–42 (citing *Harris*, 510 U.S. at 21). That is, the plaintiff must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable. *Hernandez*, 670 F.3d at 651.

To determine whether an environment is sufficiently hostile or abusive to affect a term, condition, or privilege of employment, courts look at the "frequency of the discriminatory conduct . . . whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "Simple

[6] *Hernandez* further requires that a plaintiff prove that she is a member of a protected class and that the employer knew or should have known of the harassment and failed to take prompt remedial action. 670 F.3d at 651. Every employee, however, is a member of a protected class as to sex, and employer knowledge is not required where, as here, the alleged harasser is a supervisor. *See Woods v. Delta Bev. Group, Inc.*, 274 F.3d 295, 298 n.2 (5th Cir. 2001).

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted). If the conduct alleged by the plaintiff is not severe or pervasive, summary judgment should be granted for the defendant. *Butler v. Ysleta Ind. Sch. Dist.*, 161 F.3d 263, 269–70 (5th Cir. 1998). Still, to survive summary judgment, a plaintiff "need not make it 'clear' that she was subject to actionable harassment;" she need only show that a jury could arrive at that conclusion based on the evidence presented. *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019).

Here, Defendants assert that Owen's hostile-work-environment claim fails because (1) she cannot show that the challenged conduct was sex-based, (2) Germain's insensitive and boorish commentary is not cognizable in the Fifth Circuit, and (3) she did not subjectively perceive the conduct as hostile or abusive. ECF No. 61 at 4–6. These arguments are unavailing on summary judgment, however, because they ask the Court to view the evidence out of context rather than in the light most favorable to Owen.

Defendants insist that "[w]hen pressed about why this would even be sex-based conduct, Owen could only offer 'because I was the only one it was happening to.'" ECF No. 61 at 8 (citing ECF No. 61-1, Owen Dep. at 51:15, 52:12, 53:7–10, 109:21–25). Not so. Owen testified, for example, that she believed Germain's promotion of her assistant was due to her sex "[b]ased on *Philip's behavior.*" ECF No. 61-1, Owen Dep. at 71:7 (emphasis added).

Missing the forest for the trees, Defendants first insist that Plaintiff's exclusion from text messages could not have been sex-based, pointing to six instances in which women were included on text messages and arguing that Owen could have obtained information from her husband, since he also worked at IPC. *See* ECF No. 61 at 7–8. Setting aside the problematic suggestion that a

woman should depend on her husband for communications from her employer, the other women on the text messages—identified as "Ashley Huerta, Debbie, and Mary"—were not service advisors. *See id.* at 8; ECF No. 64-2, Owen Decl. at 6 ("The only other females in the Service Department were in clerical positions."). While one text message apparently included the other female service advisor, Faulkner-Taylor has also testified in this action that Germain excluded her from group text messages and denied her bonus opportunities. *See* ECF No. 62-4, Faulkner-Taylor Dep. at 12:4–21. Similarly, Germain's promotion of Owen's assistant and refusal to allow her to service non-fleet clients is consistent with his view that "women don't really belong on the [service] drive." *See* ECF No. 61-1, Owen Dep. at 16:8–9.

In short, given the evidence of Germain's use of "sex-specific and derogatory terms" showing his "hostility to the presence of women in the workplace"—and on the service line, specifically—Defendants' position that these were merely "facially neutral," "routine management decision[s]," ECF No. 61 at 6–7, does not defeat Plaintiff's circumstantial evidence that Germain's conduct was sex-based. *Oncale*, 523 U.S. at 80–81.

Next, relying on caselaw applying an improper standard, Defendants assert that the Fifth Circuit does not recognize boorish and "insensitive commentary" as constituting a hostile work environment. ECF No. 61 at 5–6 (citing *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317 (5th Cir. 2004) and *Shepard v. Comptroller of Public Accounts*, 168 F.3d 871 (5th Cir. 1999)). As the Fifth Circuit has pointed out, *Hockman* and *Shepherd* "applied the wrong legal standard when both required the conduct to be 'severe *and* pervasive,' even as the Supreme Court has made clear that the standard is 'severe *or* pervasive.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 402-03 (5th Cir. 2013) (citing *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428 (5th Cir. 2005)

(emphasizing that "severe *or* pervasive" is the verbatim standard enunciated in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

But verbal remarks can create a hostile work environment if they are sufficiently pervasive. See *Royal*, 736 F.3d at 403 (noting that lack of physical contact is not dispositive). Moreover, the employers' statements in *Hockman* and *Shepherd* were spread out over more than a year, in contrast with "the [more] compressed time frame here, [which] makes the conduct more pervasive." *Royal*, 736 F.3d at 403; *cf. Harvill*, 433 F.3d at 436 ("To require that Harvill provide precise dates for the occurrences or provide an exact number of occurrences to support her allegations is an onerous burden not required by law. Whether her allegations are too vague to ultimately carry the day is a credibility determination, or requires weighing the evidence, both of which are more appropriately done by the trier of fact.").

Finally, Defendants insist that Owen did not subjectively perceive her working environment as hostile because "the resolution she sought was simply that 'everybody could come together and . . . figure it out and somehow fix it' so that they 'could all work together.'" ECF No. 61 at 9 (citing ECF No. 61-1, Owen Dep.at 122:10–123:3). There is ample evidence that Owen subjectively perceived a hostile environment even while hoping conditions would improve.

Viewed in the light most favorable to Plaintiffs a reasonable jury could conclude that Owen was subject to a hostile work environment. Germain's sexist comments, coupled with differential treatment in core job functions affecting compensation, preclude summary judgment on Plaintiffs' hostile work environment claim. Whether those circumstances rose to the level of severe or pervasive harassment sufficient to alter the conditions of employment is a question for the jury. *See Gardner*, 915 F.3d at 325 (a plaintiff "need not make it 'clear' that she was subject to actionable harassment").

**B. Title VII Disparate Treatment – Termination**

Title VII "discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin. In such . . . cases, proof and finding of discriminatory motive is required." *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). A plaintiff can prove a discriminatory motive through either direct or circumstantial evidence. *Portis v. First Nat. Bank of New Albany*, 34 F.3d 325, 328 (5th Cir. 1994), *as amended* (Nov. 10, 1994). When evaluating claims based on circumstantial evidence at the summary judgment stage, courts use the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

First, a plaintiff must establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she is qualified for the position at issue, (3) she suffered an adverse employment action, and (4) she was replaced by someone outside the protected class or was treated less favorably than others similarly-situated. *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. 792 and *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000)).

If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *Okoye*, 245 F.3d at 512.

If the defendant satisfies its burden of production, the plaintiff may still prevail by offering sufficient evidence to create a genuine issue of material fact that either (1) the defendant's reason is false and is a pretext for discrimination, or (2) that although the defendant's reason is true the plaintiff's protected characteristic was a "motivating factor" in its decision. *McDonnell Douglas*, 411 U.S. at 804–05; *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 394 (5th Cir. 2008). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing

that the employer's proffered explanation is false or unworthy of credence." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 218 (5th Cir. 2016).

**1. Plaintiffs' prima facie case of discrimination**

Plaintiff has made out a prima facie case of discrimination. It is undisputed that she is a member of the protected class (women); she was qualified for her role (fleet service advisor); that she suffered an adverse employment action (termination), and that her duties were assumed by Paul Carter and other male service advisors at IPC.

**2. Defendants' proffered reasons for terminating Owen**

Defendants insist that Owen was terminated based on two legitimate, nondiscriminatory reasons: "(1) that Owen's position was being eliminated because of the wind-down of the Business Link program, and (2) that the termination was accelerated when Germain discovered Owen's repair order misconduct." ECF No. 66 at 4. *See* ECF No. 65 at 3–4; ECF No. 66 at 4.

**3. Evidence of pretext**

To begin, Germain's sexist remarks provide "one ingredient in the evidentiary mix," showing animus by one of the people responsible for the termination, *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457–58 (5th Cir. 2019), and suggest that Owen's sex was a "motivating factor" in the decision to terminate her. *McDonnell Douglas*, 411 U.S. at 804–05. Plaintiffs have also proffered several reasons to believe both of Defendants' justifications for Owen's termination are pretextual.

**(a) The purported elimination of Business Link**

As to the Business Link wind-down, Defendants mischaracterize Owen's role as entirely dependent on IPC's continued membership: "Owen's job duties required her to be a service writer for vehicles in connection with the dealership's participation in Chrysler's 'Business Link'

program." ECF No. 61 at 2. But Owen was made "fleet service advisor" in 2018—before IPC had even joined Business Link. *Id.* at 8:1–9, 65:17–66:21. And some of her fleet customers did not even have Business Link accounts. ECF No. 61-1, Owen Dep. at 137:13–138:17, 139:19–23. In fact, when Germain first suggested in February 2021 that IPC might not renew with Business Link, Owen testified that she was not concerned for her job "[b]ecause not every customer is enrolled in Business Link." *Id.* at 137:9–14. On the other hand, Paul Carter—who had brought several fleet customers with him—seemed more concerned about losing Business Link but was not terminated based on the anticipated wind-down. *See id.* at 136:18–20.

In any event, it is not clear when, or even whether, IPC terminated its Business Link membership. In 2023, before the EEOC, IPC represented that Business Link was "shut down" in 2021. *See* ECF No. 64-3 at 4. At his deposition in 2025, Randy Foust testified that Business Link work continued until at least late 2022 or early 2023. ECF No. 61-2, Foust Dep. at 43:12–44:17, 44:21–45:7. When asked to identify the date which Defendants processed their last warranty claim under Business Link, Defendants identified ROs dated July 9, 2025. *See* ECF No. 64-7 at BENSON 1585–1904. Ultimately, in 2026, Defendants conceded that (1) there are no communications (including emails, text messages, and interoffice memoranda) discussing the decision to end their participation in Business Link, and (2) there are no contemporaneous documents that identify the date which Defendants ended their participation in Business Link or give notice to Chrysler/Stellantis that they were ending their participation. ECF No. 65-8 at 5–7.

**(b) Owen's purported repair-order fraud[7]**

On September 12, 2025, four days after the EEOC moved to compel discovery responses concerning the termination of Business Link (ECF No. 32), IPC asserted for the first time that

[7] Germain testified in his deposition that before the termination he compiled a chart listing alleged improperly processed ROs as well as the printed copies of the ROs themselves for review by Hornsby and Foust. ECF No. 61-3,

Owen had been terminated because she "had improperly written up RO's [repair orders] to wrongly obtain commissions she was not entitled to and decided to terminate Owen's position as fleet service manager." ECF No. 64-9 at 7.

At his deposition, Germain testified that he was alerted by a parts counter employee that Owen was submitting ROs for over-the-counter parts to take commissions on them. ECF No. 61-3, Germain Depo. at 176:18–177:11. In May 2021, he reviewed a six-month window of ROs, which he then provided to the General Manager, Wes Skidmore. *Id.* at 55:23–57:3, 177–185. Ultimately, Germain testified, he and Skidmore decided to simply eliminate the position based on the end of Business Link. *Id.* at 187:22–188:6; *cf.* ECF No. 61-2, Foust Dep. at 98:14–99:9 ("we did – were, in fact, planning on eliminating the position. This just solidified my decision to terminate early than maybe it would have happened otherwise.").

Although IPC's investigation allegedly began during Owen's tenure, Defendants did not mention the issue during the entirety of the EEOC investigation or during the litigation until four days after they were asked to produce evidence of the end of Business Link operations. *See* ECF No. 64 at 12. The Fifth Circuit has recognized that pretext can be established through shifting reasons for termination between the EEOC investigation and litigation. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 415 (5th Cir. 2007)).

Even aside from Defendants' shifting-explanations, there are reasons to doubt that Owen was terminated based on RO fraud. As Owen points out, she was listed as "rehireable" by IPC and paid all outstanding commissions, even though IPC allegedly believed at least some of them had been unearned. *See* ECF No. 62 at 7. Hornsby testified that her investigation of the alleged fraud

---

Germain Dep. at 56:7–25, 57:1–20; Ex. I, Benson 992–1050. Plaintiffs object to the admissibility of this evidence, which is the subject of a pending motion in limine. *See* ECF No. 83.

was "*ongoing* when [Owen]'s position was eliminated." ECF No. 61-4, Hornsby Dep. at 84:9–10.[8] At this point, even the nature of the alleged fraud remains unclear, as IPC witnesses have presented inconsistent testimony about how Owen obtained wrongful commissions on the ROs she submitted.[9] Regardless of the exact mechanism of the alleged fraud, there is evidence that male service advisors also allegedly obtained improper commissions on ROs but were not terminated on that basis. At some point before Owen's termination, the shop foreman, Clay Asher, complained about RO billing for work that was not performed, attaching purported examples committed by service advisors Paul Carter and Charles Kersch at some point before Owen's termination. *See* ECF No. 62-14 at 63–73. There is no evidence that Carter or Kersch were investigated or disciplined based on these allegations. At a minimum, these inconsistencies create credibility issues that must be left to the jury. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000).

Coupled with Germain's discriminatory comments about women, the evidence that Defendants' justifications for Owen's termination were pretextual establishes a triable fact issue as to whether Owen was terminated based on her sex.

---

[8] *See also* ECF No. 62-14, Conrad Dep. at 36:22–37:4 (noting that Owen was never disciplined for RO fraud because "I didn't find out about it until the very end. . . . I think at that time they had decided to just eliminate her job due to losing the fleet business.").

[9] For example:

- Foust testified Owen had been accused of going to the parts department to have her name put on orders for which she did not work with the customer at all, thus collecting an unearned commission. ECF No. 61-2, Foust Dep. at 81:15–25, 82:1–3.

- Barbara Hornsby, Benson's Chief Financial Officer and Rule 30(b)(6) witness, testified that Owen was writing up repair orders and getting commission on parts. ECF No. 62-15, Hornsby Dep. at 80:10–25, which Foust testified was permissible. ECF No. 61-2, Foust Dep. at 85:12–18.

- Wes Skidmore, IPC's General Manager, testified that the allegation was a fraud on Chrysler, not Benson, and that Owen was "trying to get warranty parts done that weren't being put on the cars." ECF No. 62-16 at 42:16–25, 43:1–5, 62:3–15.

**C. Title VII Retaliation**

In addition to prohibiting discrimination, Title VII prohibits retaliation against an employee for engaging in conduct protected by Title VII. *Laster v. City of Kalamazoo*, 746 F.3d 714, 729 (6th Cir. 2014). "Protected activity" is defined as "opposition to any practice made unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Green v. Admins. of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002), *as amended* (Apr. 26, 2002) (citing 42 U.S.C. § 2000e–3(a)).

Claims for retaliation based on circumstantial evidence are analyzed under the *McDonnell Douglas* framework. *See*, *e.g.*, *Wheat v. Fla. Par. Juvenile Justice Com'n*, 811 F.3d 702, 705–06 (5th Cir. 2016). To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that (1) she engaged in a protected activity; (2) there was a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015).

The third element, causation, is the most difficult to overcome at this stage. In the Fifth Circuit, Plaintiff must establish that the protected activity was the "but-for" cause of the adverse employment action. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022); *Wantou v. Wal-Mart Stores Tex., L.L.C.,* 23 F.4th 422, 437 (5th Cir. 2022) (in a retaliation claim under § 1981, "the employee's ultimate burden is to prove that the adverse employment action would not have occurred but for the protected conduct.").

Temporal proximity alone is insufficient to establish "but for" causation, *Strong v. Univ. Healthcare Sys. LLC*, 482 F.3d 802, 808 (5th Cir. 2007), but plaintiffs may combine "suspicious timing with other significant evidence of pretext." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). Courts have recognized many ways in which plaintiffs can

circumstantially show causation at the prima facie stage or at the pretext stage. *See, e.g.*, *Robinson v. Jackson State Univ.*, 714 F. App'x 354, 361 (5th Cir. 2017). Aside from timing, relevant evidence may include "specific conversations with knowledgeable colleagues, changed decisionmaker behavior following complaints, pretext, and parallel outcomes for similarly-situated employees." *Id.* (also recognizing and shifting employer rationales and an employer's departure from typical policies and procedures).

Owen's written complaint of sexual harassment to HR on June 10, 2021 is protected activity under Title VII. It is undisputed that Owen was terminated the next day. Alongside that "suspicious timing," Plaintiffs have presented ample evidence that the Defendants' proffered explanations for Owen's termination were pretextual, as the Court has already discussed in its analysis of Owen's disparate-treatment claim. *See Shackleford*, 190 F.3d at 409.

In addition to pretext, Plaintiffs have proffered evidence that the relevant decisionmakers were aware of Owen's complaint when she was terminated[10] and cited a "specific conversation[] with [a] knowledgeable colleague"—Lindi Conrad—suggesting that Owen's rights had been violated.[11] This circumstantial evidence is sufficient to create a triable fact issue as to causation. *See Robinson*, 714 F. App'x at 361. In sum, viewing the record in the light most favorable to Plaintiffs, a reasonable jury could conclude—based on the shifting rationales for Owen's termination, the extremely close period between Owen's HR complaint and termination, and other circumstantial evidence—that Owen would not have been terminated but for her protected activity.

[10] Randy Foust was aware of Plaintiff's HR complaint when he signed off on the termination, though he claims not to have read it. ECF No. 61-2, Foust Dep. at 136:20–23; 159:24–25; ECF No. 62-6 at 8 (employees aware of Plaintiff's allegations of discrimination in 2021 were Paul Carter, Philip Germain, Lindi Conrad, and Barbara Hornsby); *Robinson*, 714 F. App'x at 360; *E.E.O.C. v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) (decisionmaker knowledge can be shown through circumstantial evidence).
[11] ECF No. 62-2, Owen Aff. at 7.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Rebecca Owen's employment discrimination claims (ECF No. 61) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 6th day of August, 2026.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE